# Illinois Official Reports

## Appellate Court

*Dass v. Yale*, 2013 IL App (1st) 122520

| | |
|---|---|
| Appellate Court Caption | BIPLOB DASS and BRETT GARRY, Plaintiffs-Appellants, v. CRAIG YALE, Defendant-Appellee (LDC, Inc., f/k/a Lexus Development Corporation, an Illinois Corporation, Defendant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2520 |
| Filed | December 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for common-law and statutory fraud arising from the water damage that occurred in plaintiffs' garden condominium unit, which they purchased from a limited liability company of which defendant was a managing member, the trial court properly dismissed defendant's motion to dismiss on the ground that defendant was shielded from liability by section 10-10 of the Limited Liability Company Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-12717; the Hon. Lynn M. Egan, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | J. Eric Vander Arend, of Hughes Socol Piers Resnick & Dym, Ltd., of Chicago, for appellants. |
|---|---|
| | Mario A. Sullivan, of Law Offices of Peter Anthony Johnson, P.C., of Chicago, for appellee. |
| | |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices McBride and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1      According to plaintiffs, the instant case provides a case of first impression. They claim that the legislature never intended section 10-10 of the Limited Liability Company Act (the LLC Act) (805 ILCS 180/10-10 (West 2010)) to shield limited liability company members or managers who commit fraud. The trial court found immunity under the LLC Act, which caused the instant appeal arising from the dismissal of plaintiffs' fifth amended complaint pursuant to sections 2-619(a)(5) and (a)(9) of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619(a)(5), (a)(9) (West 2010)).

¶ 2      Plaintiffs' complaint alleges that plaintiffs, Dr. Biplob Dass and Brett Garry, owned a garden condominium unit that they purchased in 2006 from Wolcott LLC (Wolcott), a limited liability company of which defendant Craig Yale is the managing member. Their unit flooded in 2007 and, after plaintiffs had the sewer lines serving the unit inspected, plaintiffs discovered a number of problems with the building's sewer lines and drainage system, and further discovered that the existing sewer pipes were not as represented when they purchased the unit. Plaintiffs filed suit against Wolcott; LDC, Inc. (LDC); and Property Consultants Realty, Inc. (Property Consultants); the three entities involved in the sale of the unit. Plaintiffs also, in their fifth amended complaint, named Yale as a defendant, suing him for common-law and statutory fraud. Currently, LDC and Yale are the only remaining defendants, and Yale is the sole defendant that is a party to the instant appeal.[1]

¶ 3      Yale filed a motion to dismiss the claims against him pursuant to sections 2-619(a)(5) and (a)(9) of the Code, claiming that he was insulated from liability under section 10-10 of the LLC

---

[1]Wolcott filed for bankruptcy on July 7, 2011, and was discharged from bankruptcy on September 22, 2011, on a finding of no assets; plaintiffs voluntarily removed Wolcott from the case as of the fifth amended complaint. Property Consultants settled with plaintiffs in December 2009 and was dismissed from the case on January 4, 2011. Default judgment was entered against LDC on September 22, 2009, and LDC was involuntarily dissolved on October 9, 2009.

Act and that plaintiffs' claim based on the Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2010)) was time-barred and that Wolcott, not Yale, sold the unit to plaintiffs. The trial court granted Yale's motion to dismiss, finding that Yale was insulated from liability under section 10-10 of the LLC Act and that plaintiffs' claim under the Consumer Fraud Act was time-barred. Plaintiffs appeal, and we affirm.

¶ 4                                BACKGROUND

¶ 5    The following facts are taken from plaintiffs' fifth amended complaint, the complaint at issue in the case at bar, and from the procedural history of the case as established by the record on appeal.

¶ 6                      I. Plaintiffs' Condominium Unit

¶ 7    Plaintiffs, a married couple, owned a garden condominium unit at 4845-4851 North Wolcott in Chicago (the Wolcott Court condominiums) from December 2006 to July 2010. When the building was originally constructed, the unit purchased by plaintiffs was a one-bedroom, one-bath unit; however, the unit was being converted to a two-bedroom, two-bath unit at the time plaintiffs purchased it. In order to expand plaintiffs' unit, the floor of the unit had to be lowered to satisfy City of Chicago (the City) ceiling-height code requirements, among other changes not relevant to the instant appeal.

¶ 8    When plaintiffs purchased the unit, LDC was named as the general contractor for construction of the Wolcott Court condominiums in a property report provided to plaintiffs, Wolcott was the developer of the Wolcott Court condominiums, and Property Consultants was the sales agent for the Wolcott Court condominiums. "Until the [Allen] Liss and [Bruce] Teitelbaum[2] depositions in 2011, Dass' only knowledge of Yale's involvement in the project was his signature as manager of Wolcott, L.L.C. on the Property Report and on the Listing Agreement with Property Consultants for condominium sales."[3]

¶ 9    During heavy rains in June and August 2007, and again in the summer of 2009, plaintiffs experienced extensive flooding in their unit. The flooding was primarily caused by water entering the unit at the bathrooms' toilets and drains and at the HVAC drain. The flood damage included warping and cracking of the hardwood floors throughout the unit, damage to subflooring, and mold on the subfloors and walls in the unit.

¶ 10    After the flood damage in 2007, plaintiffs arranged for multiple inspections of the sewer lines servicing their unit. On October 29, 2007, Kerrigan Plumbing inspected the sewer lines and discovered:

_____

[2]Liss was the principal of LDC and Teitelbaum was LDC's sole shareholder.

[3]We quote this portion of the complaint because it was relied upon by the trial court to determine that the Consumer Fraud Act claim was time-barred.

"A. The Dass Unit was tied directly into the house sewer line going from the rear of the building, underneath the Dass Unit, to ultimately connect with the city sewer at the street;

B. The house sewer line under the Dass Unit was back-pitched[4], and was severely broken which allowed dirt and sand to enter and block all but 10-15% of the line;

C. The Dass Unit is the lowest point in the Wolcott Court condominiums, a condition created by construction of the Dass unit; and

D. The gutters and drains at the Wolcott Court condominiums direct rainwater to the main house sewer system at points in the back-pitched sewer line both ahead of and behind the points where the drains from the Dass Unit were tied in."

Kerrigan Plumbing concluded that new sewer piping and an independent system for insulating plaintiffs' unit from the main house sewer were necessary to significantly decrease the chance of future flooding of the unit.

¶ 11 Furthermore, the deteriorated condition of the sewer lines servicing plaintiffs' unit existed prior to the construction of plaintiffs' unit and the condition of the sewer lines in October 2007 was not as reported to plaintiffs in the property report provided to them prior to closing on their purchase of the unit. The property report stated that the contractor would conduct a closed-circuit television examination of the entire sewer system in the presence of the City's sewer inspector to confirm the condition of the system; that the existing underground sanitary waste lines would be inspected and cleared of any obstructions discovered and that damaged or otherwise unusable sections of sewers would be removed and replaced; that all existing waste lines and vents serving bathroom fixtures would be inspected for any deteriorating lines and repaired; and that all existing cast-iron soil stacks would be inspected for loose or cracked fittings or pipe and repaired. Additionally, in a feature sheet incorporated into the property report, Property Consultants represented that the building would have " '[a]ll new plumbing.' " Finally, "[a]t page 15 of the Property Report, Wolcott, L.L.C., through its manager Yale, expressly 'affirm[ed] that this Property Report and any supplements, modifications and amendments hereto, are or will be true, full, complete and correct.' " Based on these representations, plaintiffs believed that the building sewer and waste systems would be functionally new.

¶ 12 However, at no time were any of the inspections or repairs performed, based on the fact that no permit for such work was provided by the City and no videotape of the inspection was provided to the City, as is required when rehabbing a building such as the Wolcott Court condominiums while keeping the existing house sewer system. Defendants knew or should have known that none of the inspections or repairs had been done and that the representations in the property report were false, and they also knew or should have known of the measures necessary to prevent flooding of plaintiffs' unit, because they were included in the drawings for construction of the unit submitted to the City with the application for a construction permit, but chose not to implement them.

_____

[4]Plaintiffs' appellate brief explains that the house sewer line being back-pitched means that "water has to run uphill to get to the street."

¶ 13    On December 7, 2007, plaintiffs made a demand on LDC, Wolcott, and Property Consultants to repair the flood damage and pay for all costs and expenses and all professional fees plaintiffs incurred in addressing the flood damage. When resolution of the dispute was unsuccessful, plaintiffs filed suit on November 13, 2008, against LDC, Wolcott, and Property Consultants for breach of warranty, common-law fraud, and fraud under the Consumer Fraud Act. Plaintiffs amended their complaint a number of times in response to motions to dismiss from Wolcott and Property Consultants. The original complaint and first four amended complaints include allegations that Allen Liss was both the president of LDC and had a significant interest in Wolcott, and make no mention of Yale; instead, the complaints all state that Wolcott "through its manager" affirmed the property report as true.

¶ 14    In May 2009, a second plumbing contractor, hired by LDC, Wolcott, and Property Consultants, inspected the sewer lines servicing plaintiffs' unit and, like Kerrigan Plumbing, also concluded that installation of new sewer piping and a system for insulating plaintiffs' unit from the main house sewer were necessary to significantly decrease the chance of future flooding of the unit.

¶ 15    On July 1, 2009, plaintiffs filed a motion for an order of default against LDC and, on July 15, 2009, the trial court entered an order of default against LDC. On September 22, 2009, the trial court entered judgment in favor of plaintiffs and against LDC in the amount of $56,521.46. On October 7, 2009, a citation to discover assets to a third party was issued to Wolcott, and Wolcott answered the citation on October 14, 2009; Wolcott's answer was certified to be true and correct by Wolcott's agent, Craig G. Yale. This document is the first place in the record where Yale's name appears.[5]

¶ 16    On April 14, 2010, plaintiffs filed a fourth amended complaint, attached to which was the property report provided to plaintiffs prior to their purchase of the condominium unit. Page 15 of the property report contains the signature of Wolcott's "Manager," but the signature is illegible.

## II. Fifth Amended Complaint

¶ 18    On October 11, 2011, plaintiffs filed a motion for leave to file their fifth amended complaint *instanter*, and plaintiffs' fifth amended complaint was filed on October 24, 2011.

¶ 19    In addition to the facts set forth above, the fifth amended complaint also alleges that although LDC was named as the general contractor for construction of the Wolcott Court condominiums in the property report provided to plaintiffs, when a rehab permit was sought in May 2005, a different general contractor for the project was named because neither LDC nor Allen Liss, its principal, had a general contractor's license. The other general contractor performed no work on the building and work was performed by Liss's workers. The complaint alleges that Yale (1) directed or approved of work by Liss and his workers on the Wolcott Court condominiums in advance of a construction permit, resulting in a stop work order from the City; (2) directed or approved the application for the rehab permit that stated that the owner

---

[5]A "Certificate of Limited Warranty" attached to plaintiffs' second amended complaint and dated December 28, 2006, included the signature of Wolcott's "Manager," but that signature is illegible.

of the Wolcott Court condominiums would not be performing any work on the project when he knew that was not true and knew that the amount certified on the application for construction work by the other general contractor did not reflect the lower amount that would be spent on Liss's unlicensed crew; (3) knew that neither Liss nor LDC had a general contractor's license but purposefully directed or approved the unlicensed crew to do the work in order to obtain cost savings; (4) directed or approved the use of a roofing contractor that was unlicensed to perform work on a building the size of the Wolcott Court condominiums; (5) directed or approved completion of all significant construction in plaintiffs' unit prior to applying for permits for its renovation as a two-bedroom, two-bath unit while leading Property Consultants and, by extension, plaintiffs, to believe that permitting was completed during construction; (6) directed or approved drawings of plaintiffs' unit submitted with the application for a permit that showed the unit as a renovation of an existing two-bedroom, two-bath unit when that was not true so that the permit could be obtained through a " 'self-certification' " process that would not have otherwise been available; and (7) directed or approved the submission of an application for a permit for plaintiffs' unit that listed a different general contractor, when he knew that Liss's unlicensed crew would perform the construction.

¶ 20    The complaint alleges that Yale attempted to cover his participation in the fraudulent misrepresentations regarding plaintiffs' unit by (1) directing that Liss's name and a forged signature appear for the owner on the contract executed with the other general contractor; (2) directing that Liss's name and a forged signature appear as owner of the Wolcott Court condominiums in a November 30, 2006, letter to the City's department of construction and permits that agreed that, "in 'consideration of the issuance of a building permit under the Ezpaned Self-Certification program,' " Liss would indemnify the City against any claims " 'in any way connected with design, construction and/or code compliance review' " of the Wolcott Court condominiums; (3) directing that Liss's name and a forged signature appear as the owner of the Wolcott Court condominiums on the December 12, 2006, application for the permit to rehab plaintiffs' unit; and (4) directing that Liss's name and a forged signature appear on a December 14, 2006, letter on Wolcott letterhead, with Liss as " 'Member/Manager,' " to the City's department of construction and permits in support of the permit to rehab plaintiffs' unit. At his deposition, Liss denied that any of the signatures were his and, at his deposition, Teitelbaum denied involvement in any aspect of the Wolcott Court condominiums other than securing financing.

¶ 21                              III. Yale's Motion to Dismiss

¶ 22    On March 27, 2012, Yale filed a motion to dismiss plaintiffs' fifth amended complaint pursuant to sections 2-619(a)(5) and (a)(9) of the Code. Yale argued that both counts should be dismissed because under the LLC Act, members are shielded from personal liability. Yale also argued that the count concerning the Consumer Fraud Act should be dismissed because (1) it was barred by the statute of limitations and (2) Yale was not a seller or merchant under the Consumer Fraud Act.

¶ 23    In the portion of Yale's motion concerning the statute of limitations, Yale stated the following: "The Articles of Organization for Wolcott were filed with the Illinois Secretary of

State on July 7, 2004. See Exhibit B. Pursuant to the Wolcott Articles of Organization, Yale has at all times been listed and identified as sole member thereof. The information set forth in the Articles of Organization is a matter of public record and ha[s] at all times relevant hereto, been listed and easily accessible to the Owners through the Illinois Secretary of State and on its website. A true and accurate copy of the printouts from Secretary of State LLC File Detail Report are attached hereto as Exhibit 'D'." Exhibit B, the Wolcott articles of organization, are dated July 7, 2004, and list the manager as "Allen Liss"; the articles are signed by Charles J. Mack as the organizer. Yale's name does not appear on the articles of organization. Exhibit D purports to be a printout from the Secretary of State's website dated February 13, 2012, and has "Yale, Craig" listed under "LLC Managers" of Wolcott. Yale's motion to dismiss further states that "Yale has signed all relevant documents pertaining to the development of Wolcott Court Condominiums," including the purchase agreement, declaration and bylaws, property report, permit applications, and deed and other sale documents, all of which were provided to plaintiffs either prior to or at the closing of the purchase of their unit. Consequently, Yale argued that plaintiffs should have known since December 2006 that Yale was the sole member and manager of Wolcott.

¶ 24    In their response to Yale's motion, plaintiffs argued that Yale fraudulently concealed his affiliation with Wolcott and stated that Wolcott, during discovery, refused to produce any information regarding its managers or members and that it was only during depositions in 2011 that plaintiffs discovered that Yale, not Liss, was the culpable party. Attached to their response was correspondence between plaintiffs' attorney and Wolcott's attorney, in which Wolcott's attorney, in a letter dated November 6, 2009, first informed plaintiffs that the property report was executed by Craig Yale as agent for Wolcott.

¶ 25    In his reply to plaintiffs' response, Yale pointed to several documents that he signed on behalf of Wolcott that had been attached to plaintiffs' fifth amended complaint. While two of those documents, the condominium declaration and certificate of developer, do not contain Yale's signature, both include Yale's name as "Manager of THE WOLCOTT COURT LLC." The third document, the certificate of limited warranty, which was not attached to plaintiffs' fifth amended complaint but had previously been attached to plaintiffs' second, third, and fourth amended complaints, contains Yale's signature, which is illegible, and does not contain Yale's name.

¶ 26    On June 26, 2012, plaintiffs filed a motion for leave to file a surreply *instanter*, and on July 3, 2012, the trial court entered an order indicating that plaintiffs' motion "is stricken."

¶ 27    On July 24, 2012, the trial court entered a written order granting Yale's motion to dismiss, determining that Yale was shielded from liability under section 10-10 of the LLC Act and that plaintiffs' claims under the Consumer Fraud Act were time-barred; the court also found no just reason to delay enforcement of or appeal from its order. In its recitation of the facts, the trial court stated: "Plaintiffs claim that defendant's earlier absence from the litigation was due to the fact they did not learn of his involvement in any fraudulent acts until June 14, 2011. However, plaintiffs admit they were aware of defendant's role at Wolcott since his signature appeared on the Property Report they received prior to their purchase of the condominium unit. Plaintiffs

further admit they first learned of the alleged misrepresentations that form the basis of their fraud claims in October 2007."

¶ 28    In considering whether Yale was protected by section 10-10 of the LLC Act, the trial court concluded that the language of the statute indicated that Yale was protected since all of the allegations of the complaint occurred while he was acting solely in his capacity as a manager of Wolcott, and supported its conclusion by citing to two cases: *Puleo v. Topel*, 368 Ill. App. 3d 63 (2006), and *Carollo v. Irwin*, 2011 IL App (1st) 102765. With regard to the statute of limitations, the trial court noted that the statute of limitations for the Consumer Fraud Act was three years from the time that the cause of action accrued. The court rejected plaintiffs' argument that they were unaware of Yale's involvement in the misrepresentations until June 2011[6], noting that actual knowledge was not necessary for the cause of action to accrue. The court found that, "[b]ecause plaintiffs concede they learned of Wolcott's misrepresentations in late 2007, and also knew defendant was the managing member of Wolcott, they had an obligation to further investigate at that time." Since they failed to investigate, they were time-barred from raising their claim under the Consumer Fraud Act.

¶ 29    Plaintiffs filed a notice of appeal, and this appeal follows.


ANALYSIS

¶ 31    On appeal, plaintiffs argue that the trial court erred in granting Yale's motion to dismiss, claiming: (1) the trial court erred in its interpretation of section 10-10 of the LLC Act and (2) the trial court erred in determining that plaintiff's Consumer Fraud Act claims were time-barred. Additionally, while not decided by the trial court, plaintiffs argue that Yale is liable under the Consumer Fraud Act despite the fact that plaintiffs purchased their condominium unit through Wolcott, not Yale. We note that, since the argument concerning section 10-10 of the LLC Act applies to both plaintiffs' common-law fraud and Consumer Fraud Act claims, if we affirm on the basis of the LLC Act, we have no need to discuss plaintiffs' arguments concerning the Consumer Fraud Act.


¶ 32                                    I. Standard of Review

¶ 33    "A motion to dismiss, pursuant to section 2-619 of the Code, admits the legal sufficiency of the plaintiffs' complaint, but asserts an affirmative defense or other matter that avoids or defeats the plaintiffs' claim." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006); *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). For a section 2-619 dismissal, our standard of review is *de novo*. *Solaia Technology*, 221 Ill. 2d at 579; *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Kahn v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

---

[6]We note that, on appeal, plaintiffs no longer argue that the June 2011 date should govern the statute of limitations but claim that they first became aware of Yale and his connection to Wolcott during the November 6, 2009, correspondence involving Wolcott's objections to discovery.

¶ 34 When reviewing "a motion to dismiss under section 2-619, a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be drawn in plaintiffs' favor." *Morr-Fitz*, 231 Ill. 2d at 488. "In ruling on a motion to dismiss under section 2-619, the trial court may consider pleadings, depositions, and affidavits." *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 262 (2004). Even if the trial court dismissed on an improper ground, a reviewing court may affirm the dismissal if the record supports a proper ground for dismissal. *Raintree*, 209 Ill. 2d at 261 (when reviewing a section 2-619 dismissal, we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) ("we may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground").

¶ 35                                    II. Section 10-10 of the LLC Act

¶ 36 In the case at bar, the trial court found that Yale was shielded from both counts of plaintiffs' fifth amended complaint based on his status as a member of Wolcott, a limited liability company (LLC). As an initial matter, it is important to note what plaintiffs are *not* arguing: plaintiffs do not argue that Yale defrauded them in his individual capacity and do not argue that Yale should be liable through the doctrine of piercing the corporate veil. Instead, plaintiffs argue that section 10-10 of the LLC Act does not exempt LLC members or managers from personal liability for torts or fraud committed in their capacity as members or managers of the LLC. Plaintiffs argue that, "[g]iven that Yale would be liable to plaintiffs for fraud based on plaintiffs' allegations if Yale acted individually, that he defrauded plaintiffs while a member/manager of Wolcott LLC should not provide him protection."

¶ 37 The trial court's decision was based on section 10-10 of the LLC Act, which provides:

"(a) Except as otherwise provided in subsection (d) of this Section, the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager.

(b) (Blank).

(c) The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company.

(d) All or specified members of a limited liability company are liable in their capacity as members for all or specified debts, obligations, or liabilities of the company if:

(1) a provision to that effect is contained in the articles of organization; and

(2) a member so liable has consented in writing to the adoption of the provision or to be bound by the provision." 805 ILCS 180/10-10 (West 2010).

¶ 38 When interpreting statutes, our goal is to "ascertain and give effect to the true intent of the legislature." *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001). " 'The best evidence of

legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning.' " *Kates*, 198 Ill. 2d at 163 (quoting *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997)). When the plain language is unambiguous, the legislative intent discernible from the language must prevail and to resort to other interpretive aids is unnecessary. *Kates*, 198 Ill. 2d at 163. "Statutes should be read as a whole with all relevant parts considered, and they should be construed, if possible, so that no term is rendered superfluous or meaningless." *Kates*, 198 Ill. 2d at 163 (citing *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990), and *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16-17, 26 (1996)).

¶ 39   In the case at bar, the plain language of section 10-10 states that, "[e]xcept as otherwise provided in subsection (d) of this Section, the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 805 ILCS 180/10-10(a) (West 2010). Thus, "[s]ection 10-10 clearly indicates that a member or manager of an LLC is not personally liable for debts the company incurs unless each of the provisions in subsection (d) is met." *Puleo*, 368 Ill. App. 3d at 68. Here, there is no claim that Yale is liable under subsection (d), so Yale is not personally liable for the tort claim against Wolcott.

¶ 40   Plaintiffs argue that such a result is contrary to "[t]he legislative history published with [section] 10-10" of the LLC Act. Plaintiffs' argument relies on comparison of section 10-10 of the LLC Act to section 303 of the Uniform Limited Liability Company Act (1996) (the Uniform Act), which contains substantively the same language as section 10-10. Section 303 of the Uniform Act includes a comment stating:

> "A member or manager, as an agent of the company, is not liable for the debts, obligations, and liabilities of the company simply because of the agency. A member or manager is responsible for acts or omissions to the extent those acts or omissions would be actionable in contract or tort against the member or manager if that person were acting in an individual capacity." Uniform Limited Liability Company Act § 303, Comment (1996).

Plaintiffs claim that the comment to section 303 of the Uniform Act was "incorporated" into the LLC Act by "the Illinois legislature," pointing to the "Historical and Statutory Notes" to section 10-10 that indicate that "[t]his section is similar to" section 303 of the Uniform Act (805 ILCS Ann. 180/10-10, Historical and Statutory Notes, at 42 (Smith-Hurd 2010)). However, the "Historical and Statutory Notes" are not part of the LLC Act itself but were added by West, the publisher of the annotated statutes. See Style Manual for the Supreme and Appellate Courts of Illinois § III(B)(3) (4th ed. rev. 2012) ("Quoting Illinois Statutes"). Furthermore, while some states adopting the Uniform Act have also adopted the comment to section 303, Illinois has not done so. See, *e.g.*, *16 Jade Street, LLC v. R. Design Construction Co.*, 728 S.E.2d 448, 453 (S.C. 2012) (discussing South Carolina's analogue to section 303 of the Uniform Act). Accordingly, while section 303 of the Uniform Act and the comment accompanying it are persuasive authority in interpreting section 10-10 of the LLC Act due to the similar language used, neither is formally part of the LLC Act. Furthermore, here, we find

plaintiffs' reliance on the cases interpreting section 303 of the Uniform Act and its comment to be of little value, since our interpretation of the LLC Act must take into account the LLC Act's history and other cases interpreting it.

¶ 41     Indeed, examining the history of LLC Act itself demonstrates that the trial court was correct in interpreting section 10-10 to shield Yale from liability. The current language of section 10-10 has been in effect since January 1, 1998. See Pub. Act 90-0424 (eff. Jan 1, 1998). Prior to that, section 10-10 read:

> "(a) A member of a limited liability company shall be personally liable for any act, debt, obligation, or liability of the limited liability company or another member or manager to the extent that a shareholder of an Illinois business corporation is liable in analogous circumstances under Illinois law.
>
> (b) A manager of a limited liability company shall be personally liable for any act, debt, obligation, or liability of the limited liability company or another manager or member to the extent that a director of an Illinois business corporation is liable in analogous circumstances under Illinois law." 805 ILCS 180/10-10 (West 1996).

Generally, a change to the unambiguous language of a statute creates a rebuttable presumption that the amendment was intended to change the law. *State v. Mikusch*, 138 Ill. 2d 242, 252 (1990). Here, the language of the LLC Act was changed by removing language explicitly providing for personal liability. As we noted in *Puleo*, "[a]s we have not found any legislative commentary regarding that amendment, we presume that by removing the noted statutory language, the legislature meant to shield a member or manager of an LLC from personal liability." *Puleo*, 368 Ill. App. 3d at 69.

¶ 42     Additionally, we have interpreted section 10-10 in several cases, most notably in *Puleo*. There, we considered whether the defendant could be personally liable for obligations incurred on behalf of an LLC after the company was involuntarily dissolved. *Puleo*, 368 Ill. App. 3d at 64. We examined the language of section 10-10 and noted that, under the express language of the LLC Act, since the plaintiffs had not demonstrated that the provisions of subsection (d) were satisfied, the plaintiffs could not establish the defendant's personal liability for debts that the LLC incurred after its dissolution. *Puleo*, 368 Ill. App. 3d at 68. We also considered the amendment to section 10-10 and found that the amendment was meant to shield a member or manager of an LLC from personal liability. *Puleo*, 368 Ill. App. 3d at 68. Consequently, we affirmed the trial court's dismissal of the plaintiff's complaint. *Puleo*, 368 Ill. App. 3d at 70.

¶ 43     We again interpreted section 10-10 the same way in *Carollo*, where we considered whether the defendant could be personally liable for debts incurred on behalf of an LLC prior to its formation. *Carollo*, 2011 IL App (1st) 102765, ¶ 2. There, we noted that, under general principles of agency, the defendant would ordinarily be personally liable under a contract he executed on behalf of the unformed LLC. *Carollo*, 2011 IL App (1st) 102765, ¶ 52. However, we noted that section 10-10 of the LLC Act provided "an important statutory distinction between LLCs and corporations that provides members or managers of unformed LLCs with more protection from personal liability than officers of corporations in this context." *Carollo*, 2011 IL App (1st) 102765, ¶ 53. Relying on the language of section 10-10 and our earlier

holding in *Puleo*, we found that the defendant could not be personally liable under the LLC Act. *Carollo*, 2011 IL App (1st) 102765, ¶¶ 54-61.

¶ 44   Plaintiffs distinguish *Puleo* and *Carollo* by arguing that neither case involved application of section 10-10 to a LLC member or manager's tort or fraud and only involved the member or manager acting without authority because the LLC did not exist. However, the express language of section 10-10 provides that "the debts, obligations, and liabilities of a limited liability company, *whether arising in contract, tort, or otherwise*, are solely the debts, obligations, and liabilities of the company." (Emphasis added.) 805 ILCS 180/10-10(a) (West 2010). We see no reason why the reasoning of *Puleo* and *Carollo*, which focused on the language of the LLC Act and its amendment, would not apply to a liability arising in tort, as in the case at bar, when such a scenario is expressly contemplated by the language of section 10-10.[7] Accordingly, we affirm the trial court's dismissal of plaintiffs' complaint.

¶ 45                     III. Consumer Fraud Act

¶ 46   Plaintiffs also raise several arguments concerning the dismissal of their claim based on the Consumer Fraud Act. However, since we have determined that Yale is shielded from personal liability by section 10-10 of the LLC Act, there is no need for us to consider plaintiffs' arguments focusing on the Consumer Fraud Act claim.

¶ 47                     CONCLUSION

¶ 48   We find that Yale was shielded from personal liability based on section 10-10 of the LLC Act. Accordingly, the trial court properly dismissed plaintiffs' claim under section 2-619 of the Code.

¶ 49   Affirmed.

---

[7]We note that *Puleo* was somewhat limited in *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960 (2008), where we found that section 10-10 did not bar actions involving piercing the corporate veil. However, in the case at bar, there has been no claim that the corporate veil should be pierced.